and others, other than not to exceed 15 minutes per side, is released for the public. Good morning, Your Honors. May it please the Court, I'd like to reserve, if I could, five minutes for rebuttal. Your Honors, there are two issues that I'm going to address this morning, although obviously our brief was more substantive than that, but I think that these two issues are at the heart of this case. First, the reasonableness of the restrictions at issue in connection with the 2014 U.S. Senate debate that were imposed by the public which are the defendants in this matter. And secondly, the viewpoint discrimination, including the pretext that we believe the criteria, in fact, were. I'm going to address some facts as well as the law, and there's a lot of interplay with the legal issues in this case. As this Court may be aware, the challenges to the criteria themselves were decided on a motion to dismiss the viewpoint discrimination claims on summary judgment. Both result in de novo review before this Court. Your Honors, just a couple of facts. The criteria themselves in 2014 were imposed due to viewpoint discrimination. And I want to be clear, we are looking at the facts in a manner that takes the facts, including a lot of emails, and draws inferences in favor of our clients, because that's the procedural posture that we're in. I don't see in the District Court record what viewpoint you told the District Court was being discriminated against. Your Honor, I think there were... What was the viewpoint that you told Judge Van Tatenhove? It was against the political party. It was the viewpoint of the legislative views. Against Libertarians? Yes, Your Honor. And where did you say that, argue that, to Judge Van Tatenhove? I'm having a hard time finding it. It seems like you're complaining about being excluded, and it's almost like you're assuming there was viewpoint discrimination, but I'm kind of struggling to see what viewpoint is actually discriminated against here. Well, I guess I'm asking kind of a record question at the moment. So, I mean, what would you direct me to? Your summary judgment brief, a particular page or something? Your Honor, I think it was throughout the entire summary judgment brief, and I'm happy when I stand back up and rebuttal to give you exact page sites on that. But it was throughout the entire summary judgment brief and the opposition, obviously, that was put on, or specifically our opposition that was put on to the Defendant's Motion for Summary Judgment. There was a lot of recitation of the facts, and we argued the law in that motion as well. And what the position was that we took was, look, you know, we are Libertarians, and our candidates were excluded because they were Libertarians. That is a viewpoint discrimination claim. And I think the U.S. Supreme Court just alluded to it last month when it discussed the Minnesota voters case. And it talked about the fact that what they didn't have in that case were viewpoint discrimination. There was nothing that would suggest that anybody was being discriminated because of their political affiliation. In this case, Your Honor, the record evidence, we cited it below, and we cited it in the briefing, was that we believe that Mr. Patterson was, and a reasonable jury could draw the inference in the conclusion that Mr. Patterson was excluded and was targeted due to his political party affiliation. And that's been throughout the briefing. So affiliation with the political party and viewpoint are identical? I believe that that's correct, Your Honor. And, in fact, if you look at the Kerry case, for instance, that came out of this court, we know that a political party affiliation is nothing more than a combination of viewpoints, a particular platform that a party espouses. This Court's recognized that in the Kerry case. The U.S. Supreme Court alluded to it last month in the Minnesota voters case. And we believe that they are one and the same. If you're targeting somebody because of their political party affiliation, that is the sine qua non of viewpoint discrimination. How do you get there? How do you get that they're targeting him because he's a libertarian? Absolutely, Your Honor. And let's talk about some of the record evidence that suggests that that is, in fact, the case. One of which, well, I would start with the May 2014 email from Brower to Shea Hopkins that's in the record. And that's specifically at Exhibit 88, it's page ID 2821 to 2822, where this email goes out and he says, in imposing these criteria, that they wanted to get it on immediately following the primary because on the record today, since it's willing to eliminate the write-in and the other candidate from the forum, it was agreed by the group yesterday that we should do that. Tim and Julie both responded with minor corrections and expressed no problems with the overall idea. The rest of the group was aware of who that was. When we asked Ms. Clark who was the other candidate, she said, well, hey, that could be Mr. Patterson or Marksbury or both, and she was aware of both. Then we get the June 5th, 2000... Well, wait a minute. That's excluding a whole bunch of people or multiple people, not all of whom are libertarians. So why does that tell us that libertarians are being targeted? Your Honor, I don't think that that was the only viewpoint discrimination that was going on. Mr. Patterson was... The viewpoints of everybody who didn't have, you know, 10 or 15 percent? I mean, that's kind of what it seems to be edging towards. I don't think that's right. I think that there were particular viewpoints that were excluded. I think this all started with an attempt to ban out-of-state abortion candidates that had previously come up. And I think that it continued to morph into excluding anybody that they were of the view of, expressed eccentric views, non-standard views, anything outside of mainstream orthodoxy. And it's not the government's place to be doing that. But I want to continue with the record because I think it's important. There's a June 5, 2014 email. It's in the record. It's at Exhibit 114, page ID 2862. And we see this email. And the email says, please confirm we did not and will not invite David Patterson, Lib, and Ed Marksbury into the October 13th program. And there's some additional follow-up. And Mr. Goodman responds by an email. And he says, well, even if they meet the criteria, we're going to make sure that we don't put them on that same program. They can maybe do a separate program. But somehow they managed to meet our criteria. What page has what you just said with Mr. Goodman's response? Absolutely, Your Honor. There's actually several. The actual email response. What you were just reading. Right. Where would I find that in the record? Exhibit 116. And that's at page ID 2865. And his testimony about it was at page ID 2580 in the record. Then we get to this polling criteria that continues to be tweaked. And what we see is that they go out and they research where Patterson is in the poll. Their lawyer says, hey, you know, 5 to 10% is okay. And they set 10. And when we asked them why, they gave us no answer at all. None of the defendants did. And that's also in the record. Finally, Your Honor, two other points that I would make about this. After sort of the board member responds and says, wish there was no Libertarian candidate. I think that is evidence of political party targeting. And that evidence is at Exhibit 164, page ID 2982. He also says, I don't believe that the Libertarian candidate meets our minimum criteria. Your Honor, that was the response by the Executive Director. The board member, though, that oversees that Executive Director says, wish there were no Libertarian. And Goodman's response to that was, thank you. That could mean a lot of things. It could mean that we think, you know, it hasn't been, you haven't met the criteria all along and we're getting tired of this. I mean, you know, some of this stuff is obviously regrettable that they have in these emails. But whether it would allow a jury to find that Libertarians in particular were targeted. Well, Your Honor, this would be my response. If we look at the evidence and we can draw several conclusions from it, at this stage of the proceedings, in the summary judgment posture of this case, those inferences have to be drawn, whether the defendants like it or not, in the manner that is most favorable to our claims. And the reasonable inferences to be drawn from it. And that's the summary judgment standard. There's one final thing I think this Court needs to note. After all this is going on, after the lawsuit is filed, Mr. Goodman has this email exchange with his friend Al Cross and you see this in the record at, it's in record ID 82-2, page ID 3887-3889. And what we see is this question that he asks. Should I take the fifth? He's had prior advice of counsel about what he's allowed and not allowed to do. And a reasonable inference to draw is they know that they probably violated the law in the First Amendment issues and he's concerned about it. That there was engagement in political party targeting. Now, I do want to talk briefly, and I'm running out of time, but I want to point out the pretext notion of this case. And when I stand back up, I want to address the criteria themselves. Ward v. Polite was a 2012 case out of this Court and it involved religious views and pretexts of termination. We cited it in our brief. And there's a lot of parallels to draw with the Ward case. It was an after the fact justification in that case and this. There was a non-published policy that was claimed as the basis for the action. Again, there was no publication of these criteria to anyone. That was true in Ward. That's true here. It's true in Forbes, too, because there were no criteria. Well, that's true. And the beauty of Forbes, Your Honor, is that there was a jury. The matter of pretext and viewpoint discrimination went to the jury in that case and the jury determined that it didn't happen. We don't have that here. That's not the posture here. But the absence of written criteria, published criteria, would seem to be irrelevant given Forbes. I don't know that that's true. Forbes indicates that you can't have viewpoint discrimination. There was a jury finding that it didn't occur in that case. I know about, yeah. Well, you reserved a lot of time, so I'm not going to. Thank you, Your Honor. I'll address the rest when I get back up. May it please the Court, Counsel. Forbes just came up. And the Supreme Court decided every case in Arkansas Educational Television v. Forbes. It's almost impossible to find a more on-point precedent for this case than the Forbes case. In the Forbes case as here, a public television station excluded a candidate with a lack of demonstrated support from a non-public candidate forum. The candidate here, David Patterson, over the course of a year-long campaign, raised $0 in fundraising and never pulled higher than 7%. And that is why he was excluded. It was his status as a demonstrably unsupported or marginally supported candidate that led to his not being invited to the October 13, 2014, edition of the Kentucky Tonight program. As in Forbes, his exclusion was reasonable and viewpoint neutral. Interestingly, as was just briefly discussed, Forbes actually was a 6-3 case. The six justices who found in favor of the public television station said that ad hoc reasons, as long as it is OK for excluding a candidate like Mr. Patterson from a forum like this. The dissent also agreed it is OK, it is constitutionally permissible to exclude a candidate in Mr. Patterson's status from a forum like this, but the dissent's problem was that there were no pre-established criteria. The dissent in Forbes said there need to be pre-established criteria for such an exclusion to be constitutional. Here, KET used pre-established criteria. They were ever evolving. They did change over time. That is correct, Your Honor. But if this case were sent to the Supreme Court, if this fact pattern were sent up to the Supreme Court instead of the one in Forbes, this would have been a 9-0 decision in favor of the public broadcaster. Because you make new rules every time. You take a look at the pool of candidates and you say, well, who do we want to hear from? And decide, well, that guy, that guy, that guy, we don't like what they have to say, and then you write your criteria to reach that result. That's not what happened here, and that's not what happened in Forbes. What happened here was exactly what happened in Forbes. The editors at Kentucky Educational Television determined that it would be in the best interest of their viewers during this forum, which is of limited time, this is a one-hour forum, to limit the participation of this forum to those candidates who had demonstrated a level of support worthy enough of getting this limited amount of time for the Kentucky viewers. But, okay, I mean, I understand that that's wrong. What do you do with the evidence to the contrary that they have? I would submit to you, Your Honor, there is no evidence to the contrary. This is a viewpoint discrimination case where there has been absolutely no evidence of viewpoint. What do you do with the emails? The emails, if they are taken in context and read as a whole, as opposed to half sentences cherry picked out, show that KET was doing exactly what it was allowed to do. It was going through the process of determining and instituting and applying viewpoint neutral criteria to set the stage for this program and to do nothing other than exclude the candidates whose status did not justify them getting a significant portion of time on this limited time program. In all of the emails that were cited today, if they are viewed in their whole, in no way, shape, or form, support the conclusion, the unreasonable inference that the Libertarians are drawing from them. I'll take one for an example. I mean, you know, flush one out for us. Absolutely. We're talking about the June 5, 2014 email that they cited. This was an email that, what happened here, here's the background of this situation. Tim Bischoff, one of the defendants, is the marketing director at KET. He received an email from a reporter at WHAS television in Louisville, Kentucky, asking him, actually he received a phone call asking him, hey, are David Patterson and Ed Marksberry going to be invited to the program because on June 5th, Secretary of State Alison Lundergan Grimes had accepted the invitation. Tim Bischoff, the marketing manager, sent an email to Deidre Clark, Mike Brower, and Bill Goodman, who were the three editors who actually came up with the criteria, and said, please confirm we did not and will not invite David Patterson and Ed Marksberry to the October 13th program because they did not meet our pre-established criteria. Also, could you email me the document that's in our file? Tim, he repeated the reporter's question to Mr. Brower. Mr. Brower says, that's correct, Tim. They did not meet our criteria for invited candidates for the U.S. Senate race attached with the attachment. Mr. Bischoff, then, said, sent the criteria in a subsequent email to the reporter, confirming that these candidates, two candidates, not just the Libertarian, also an Independent, Mr. Marksberry, had not been invited to this forum because they did not meet the criteria. This was an application of the criteria. The fact that Mr. Patterson is a Libertarian and was excluded because his status was that he did not meet the criteria is not evidence in any way, shape, or form of any kind of animus or dislike of a Libertarian viewpoint. There is nothing in the record as to what the Libertarian viewpoint is. There is nothing in the record that the three individuals who came up with and applied the criteria had any disdain or dislike of the Libertarian viewpoint. But if party affiliation and viewpoint are essentially equal, the same thing, not equal, the same thing, why does that matter, that there is no evidence in the record with regard to actual viewpoint? Because under Forbes, there has to be some proof that the motivating factor in the exclusion was based upon the candidate's viewpoint, not their viewpoint. The exclusion was because he was a Libertarian. That's correct. There is absolutely no evidence in the record that his exclusion was for any reason other than his status as an unsupported candidate. If you had a situation where you had the two major candidates and it turned out one of them was really unpopular and the polls showed that the candidate only had 9% of the votes you wouldn't hold the debate or you would have a debate with one or you would just say no, these are the two major party candidates, we'll have the debate. That person who didn't meet the criteria would not have been invited onto the program. That's correct. And so there would not have been a program, if there was only one candidate who met the criteria, you wouldn't have a two person show. That is correct. Because you had to meet these criteria to obtain an invitation to Kentucky tonight. And then what if you had like a three-way contest or what if you had a contest, well it was the general, okay, let's say there were a whole bunch of other party and everybody had about, you know, just across the board, everybody had 20%, they'd all be in it? They would, yes, if they met the criteria. Because what the criteria do is this is again valuable air time and it is limited in nature. And in order to get on the stage and be given a chunk of that air time, you have to demonstrate, there has to be a demonstrated level of support to warrant that. So if you had five candidates polling at 20%, it would be in the viewer's interest to have five candidates and have them on the stage. Why did you make the cutoff so early? Or do I misunderstand? You made the decision like right after filing that he wasn't eligible? That is not correct, Your Honor. What happened was this. Criteria were put in place before the primary elections. The primary elections took place. KET then tightened the criteria. The day after the primary for the general election. And then the final decision as to who would be invited or not was made on the deadline, or right at the deadline of August the 15th of 2014. That was the deadline for a candidate to meet the criteria. Whoever didn't meet the criteria who did on the 15th of 2014 was in and whoever didn't was out. But are you saying all the campaign activity started a lot earlier? A lot earlier. Mr. Patterson's in particular, the proof is that he started gathering signatures to get on the ballot in November of 2013 and tried to start raising money in December of 2013. And if somebody was self-funded, would that qualify? If they had raised $100,000 reported to the FEC, that would be what qualified under that criteria. And again, these criteria are eminently reasonable. We're talking about a race where over $40 million was raised. What KET required was that Mr. Patterson or any other candidate, regardless of party, regardless of viewpoint, all they needed to do to get invited to this program was have $100,000 reported to the FEC and have polled at 10% or more in any independent poll. But this is important. They had to be a legally qualified candidate. That may go without saying, but Mr. Patterson wasn't even a legally qualified candidate who was on the ballot until August 11th of 2014 because of lack of public support. But he was prior to the August 15th cutoff. He was, yes. He was on the ballot. He qualified in other regards he would have been. That is correct. He was on the ballot, and he had a website that stated three issues. Those were the two other criteria. He undoubtedly met those two criteria. The criteria he didn't meet were the fundraising criteria and the polling criteria, which were eminently reasonable criteria. Is there any evidence in the record, I mean I realize that the emails might be viewed this way, I don't know if they are or not, but is there any evidence in the record from which a legitimate and reasonable inference could be drawn that as they set the criteria the board was thinking, boy we just sure hope the Libertarian candidate can't make this? Absolutely not. There is no evidence of that fact. When we are talking about this email from Donna Moore Campbell, who is one of the board members, the timing does matter. That email came about on August 16th, 2014, after the field was set. There is absolutely no evidence, nor could there be, that Ms. Campbell or any other board member had any kind of conversation or any kind of influence on the three independent editors who actually set and applied the criteria. Is she the one who said I wish there were no Libertarian candidates? She did, but the timing is important on that as well. Because on that date, the Libertarians, well that was the date after the deadline was set, that was the date after the deadline, that was the date after the field was set, Senator McConnell had accepted the invitation, Secretary Grimes had accepted the invitation, and what Ms. Campbell was doing was sending a congratulations email that we had a program with candidates on there. The Libertarians were complaining at that point that they were not invited. They had gone to the press with that. It was well known that they had not been invited. Ms. Campbell said I wish there were no Libertarian, to which the Executive Director of KET, Shea Hopkins, responded the reason there will not be a Libertarian and the reason there will not be is because he did not meet the criteria. It was again his status. It had absolutely nothing to do with viewpoint and there is absolutely no nexus between Ms. Campbell and the editors who actually made the decision and applied the criteria whatsoever. She had no influence, no impact whatsoever, and there is no evidence, nor could there be to that effect. Again, the criteria fall squarely in line with what was permitted in Forbes. As far as the $100,000 criteria, I know that my opponent is going to address reasonableness here. I see I am short on time. But the $100,000 claim, interestingly, the claim that was pleaded was that the $100,000 is unreasonable because it discriminates against candidates who conceivably don't believe in significant fundraising. The district court dismissed that claim for lack of standing because the record was undeniably clear that the Libertarians do believe in fundraising and unlimited fundraising. They had no standing to take the position that they were being discriminated against and on appeal, the Libertarians do not challenge the actual grounds for the dismissal of their challenge of the $100,000 criteria. But even if they did, what is important here, too, is there would be no standing, and I will finish my sentence right here. There would be no standing even if the claim is the $100,000 bar should have been lower. The fact is Mr. Patterson didn't raise a single dollar. So even if, and I disagree, I think $100,000 is eminently reasonable, but even if it was lower, he wouldn't have had the money to challenge that. For those reasons and all the reasons stated in our brief, I respectfully ask that this court affirm the district court in every respect. Thank you. Thank you, counsel. Your Honor, just a couple brief rebuttal points and then I do want to address the reasonableness of the criteria. You asked if they were aware in setting the criteria that Mr. Patterson would not meet the criteria. The answer is yes, and the evidence and actual testimony was that, in fact, they were aware. And Ms. Clark testified, she knows what she knows and she can't unknow where the polling is. They were aware and inferences, they designed these criteria to make sure he didn't make the ballot. I would point the court to the record, page ID. We have to sequester the public television executives before they can design criteria? Your Honor, I would say... I mean, they know, of course they know, of course they're generally aware. I mean, that doesn't tell us anything. It does when you continue to alter the criteria again and again and again. Primary, general, okay, primary by its nature, you might look at the Republican primary, you know, for the presidency, I mean, 17 up there. General is different too and you're not splitting it among 17 and maybe you should have a higher percentage support number than you did in the primary. And maybe that would be okay, Your Honor, except that when they set the criteria in February of 14, it applied to both general and primary. Well, they changed their mind. I mean, Forbes gives them tons of latitude. We're not going to micromanage, oh, you can't change it after May 15th or something. Forbes, journalistic discretion, reasonable. Why doesn't that apply to timing as well as content? Because it goes, Your Honor, to the issue of, in particular, viewpoint discrimination. You asked if there was evidence of targeting. There's evidence of targeting at page ID 35, 14, and 15 that, in fact, they knew where he was before they did it. But more to the point, and I do want to distinguish Forbes because I think it's important to do that, Forbes talked about the notion that, in that case, I think the candidate ran a campaign that he described as bedlam. There was no support whatsoever. Patterson goes out, and I realize there's all this talk about fundraising. Understand that the fundraising that was done here, including the fundraising that put him on the ballot, and there was, I think, $20,000 to $25,000 that was spent to do that, was done through the Libertarian Party itself. Would they have done it through the Patterson campaign if they were aware that there's this fundraising criteria? Sure. But they've already got an FEC filing ID and everything else the party does versus the candidate campaign, and so that's how that was handled, and that's why... Candidates do raise money, and I guess that's one criterion they're looking at. I mean, your client raised $0. I mean, that's... He did, and he could have raised... Most candidates that have any prospect of success do raise some money. Your Honor, there was a congressman in Kentucky, Congressman Natcher, never raised a dime. He wouldn't take it, and yet he continued to be reelected. So I don't think fundraising, and I don't think the U.S. Supreme Court would say that is the equivalence of support. Aren't you sort of saying the criteria would be fine as long as they're below wherever your candidate was? Your Honor, I don't think so, and I do want to address the reasonableness of the criteria. First of all, it's our position that any fundraising criteria is unreasonable. It's a wealth-based criteria under Lubin versus Panish. These are ballot access cases? They are, but... I mean, have nothing to do with journalistic discretion as Forbes describes it. Your Honor, I would go back to the Cornelius case where the Supreme Court talks about you've got to assess reasonableness in light of the total context of the situation. Keep in mind the state interests in these debates are very similar, almost identical to the state interests that are postured in ballot access. It's about avoiding overcrowding in both cases. I mean, and it's identical to the state interests in Forbes where the court said the broadcast executives have significant journalistic discretion. Like it or not, I mean, that is the law as it comes to us. It's not the ballot access stuff. It gives them a lot of leeway on these criteria. Well, Your Honor, Forbes says two things. No criteria in Forbes. Well, what Forbes says is it's got to be reasonable, and they looked at the totality of a number of factors that the Supreme Court looked at in Forbes to determine that it wasn't reasonable. For instance, Forbes described his campaign organization as bedlam and zilch. That's not the case with Mr. Patterson. I mean, polling 7% is kind of a big deal. Patterson ran a legitimate campaign. Patterson obtained 5,000 signatures, got himself on the ballot, was getting national press because of this race. It's not Forbes. It's just not Forbes. And so I think the notion of the reasonableness has to be viewed in light of that. I would also say that... 6% would have been fine. I think, Your Honor, I think you could look at 5% and say that it's fine, and I think that's why their attorney gave him the advice set at 5 to 10, because that's what he's used to. But 10 wouldn't, though. The attorney said 5 to 10, and yet they picked 10. Why they picked 10? Because they looked at where he was polling, and they wanted to make sure he wasn't in. And so I think... I mean, you know, you're just saying that, but... Your Honor, I'm not saying that. The evidence in the record supports that. Well, I know you think so, but... We don't have the testimony... That's the question before us. Well, and the testimony that I'd go back to, again, I'd point the Court to page ID 3514 and 3515, the deposition of Deidre Clark, where she testifies to that. And she knew what she knew, and they knew it when they set the criteria, and they went back in and they did research. She testified that, yes, we looked and saw where he was, and so set it at 10? That they looked, they did additional prior research on third-party candidates, and they set it at a level that nobody was going to meet. Absolutely. That was the testimony. Well, not that nobody was going to meet, that Patterson wasn't going to meet. You're attributing cause and effect here. There are two facts that sort of exist at the same time, I guess, and you're saying there must be this relationship. And maybe there isn't. I mean, they set criteria in these things around the country all the time, and I'm sure these people are pretty aware of how various candidates are doing. They're probably interested in this stuff if they're in this line of work. Doesn't mean they're all discriminating. Your Honor, I think the real question is whether or not a reasonable jury can draw an inference that in fact there was discrimination from this evidence, and I think the answer is yes. Look at the 100,000. That is the question. I agree with you. They would have to conclude that it was discrimination against the viewpoint. I mean, it may very well be that from the start they only wanted the two major candidates. Is that unconstitutional? That gets awful close to discriminating against all other political views and affiliations and deciding government orthodoxy, which is the heart of the viewpoint discrimination cases. I think, I don't know. I think Forbes says, it certainly makes sense to me. I mean, he's a legitimate candidate, you know, why not let him participate, but Forbes says that they get to make those editorial decisions. Forbes says they get to do it if it's reasonable, Your Honor, is the one prong, and they can't discriminate against viewpoint, which is the second prong, which is why part of the debate in Forbes was whether or not there was going to be a forum analysis at all, and the Supreme Court determined yes, it's a non-public forum. So there's not this absolute blanket rubber-stamping discretion. Forbes doesn't stand for that proposition. Thank you, Your Honor. Thank you, counsel. The case will be submitted. Clerk may call the next case.